[1]UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS, FLORIDA

**FRANK E. STARKS**
    Plaintiff,

-vs-                                      CASE NO. 2:06-cv-427-FtM-29DNF

**MICHAEL J. ASTRUE**[2],
**Commissioner of Social Security**
    Defendant.
_____/

## REPORT AND RECOMMENDATION

### TO THE UNITED STATES DISTRICT COURT

The plaintiff, Frank E. Starks, appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying his application for social security disability, disability insurance benefits and Supplemental Security Income[3]. For the reasons set forth below, it is recommended that this case be **REMANDED** pursuant to 42 U.S.C. § 405(g).

---

   1       Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should, therefore, be substituted for Commissioner Jo Anne B. Barnhart as the defendant in this suit. No further action need to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

   3       Because the disability definitions for DIB and SSI benefits are identical, cases under one statute are persuasive as to the other. *Patterson v. Bowen*, 799 F.2d 1455, 1456 n.1 (11th Cir 1986); *McCruter v. Bowen*, 791 F.2d 1544, 1545 n.2 (11th Cir. 1986).

The Commissioner has filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties have filed legal memorandums.

**I.    SOCIAL SECURITY ACT ELIGIBILITY, THE ALJ DECISION, AND STANDARD OF REVIEW**

The plaintiff is entitled to disability benefits when he is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423 (d) (1)(A); 1382c(a)(3)(A).  The Commissioner has established a five-step sequential evaluation process for determining whether the plaintiff is disabled and therefore entitled to benefits.  *See* 20 C.F.R. § 416.920(a)-(f); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  The plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

On or about November 6, 2003, the plaintiff filed an application for disability, disability insurance benefits and Supplemental Security Income, asserting a disability onset date of July 3, 2002. [Tr. 9].  The plaintiff's application was denied initially, and he has exhausted his administrative remedies.  The plaintiff meets the non-disability requirements for a period of disability and disability insurance benefits set forth in section 216(I) of the Social Security Act through December 31, 2008. [Tr. 9, 11].   The plaintiff must prove that he was disabled on or before that date.  20 C.F.R. § 404.131(a)(1999).

The Decision of Administrative Law Judge (ALJ) Elving L. Torres, dated May 24, 2006 [Tr. 9-17], denied the plaintiff's claims for disability, disability insurance benefits and found the plaintiff not eligible for Supplemental Security Income. [Tr. 17] At Step 1, the ALJ found the plaintiff had not engaged in substantial gainful activity since June 3, 2003, which is his alleged date of disability onset (20 C.F.R. § § 404.1520(c) and 416.920(c). [Tr. 17]. At Step 2, the ALJ found the plaintiff has the following severe impairments: obesity with sleep apnea, non insulin-dependent diabetes mellitus type 2, essential hypertension without end organ disease, acute episodes of pancreatitis and depression with a Global Assessment of Functioning (GAF) of 50. [Doc. 12]. The ALJ further found that the plaintiff exaggerated his symptoms and restrictions, and that the medical signs or laboratory findings are not to the extent alleged nor is the plaintiff entirely credible because of the reports of the treating and examining physicians. [Doc. 15]. At Step 3, the ALJ found these impairments did not meet or equal, either singly or in combination with any other impairment, any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, Regulations No. 4 (20 C.F.R 404.1520(g) and 416.920(g). [Tr. 17]. At Step 4, the ALJ determined the plaintiff was unable to perform his past relevant work as a block mason - which is performed at the medium exertional level and skilled in nature; or - as a grounds keeper, classified as medium in exertion and semi-skilled in nature. (Tr. 15). The plaintiff was 47 years old on his alleged disability onset date, which is defined as a younger individual 45-49 (20 C.F.R. 404.1563 and 416.963). At Step 5, with the testimony of a vocational expert and reliance on Medical Vocational Rules 202.18 and 202.11 as a frame-work for his decision making, the ALJ determined that there are a significant number of jobs in the national economy that the

plaintiff could perform. [Tr.266-270]. Vocational Expert, Jeffrey E. Carlisle, testified that a significant number of jobs existed in the plaintiff's geographical area which the plaintiff could perform considering his age, education and residual functional capacity [Tr. 16]. Accordingly, the ALJ found the Plaintiff was not disabled.

The plaintiff sought review by the Appeals Council on June 12, 2006. [Tr. 6]. The Appeals Council denied plaintiff's request on June 30, 2006. [Tr. 3-5]. Under 42 U.S.C. 405(g), Plaintiff requests judicial review of the Commissioner's final decision.

## II.     REVIEW OF FACTS

The plaintiff was born on February 8, 1956, and was 49 years old at the time of his hearing. [Tr. 251]. The plaintiff never completed the 12th grade and has never obtained his GED. [Tr. 252]. The plaintiff has worked as a concrete block mason for approximately 15 years and as a lawn service worker. [Tr. 77, 253, 254]. The plaintiff attempted to work part time at Wendy's as a grill cook but left this job after only 2 weeks because he kept passing out on the job. [Tr. 63].

The plaintiff's primary care provider was the Family Health Center. The plaintiff was seen at the Health Center from August 1997 through August 2004. [Tr. 166-189]. The plaintiff's records reveal that he was seen for a variety of ailments. The plaintiff reported abdominal pain, hypertension and pancreatitis. The medical notes indicate that the plaintiff's weight was averaging 340 lbs. The plaintiff was advised about monitoring his blood sugar and his diet. The plaintiff has complained of sleep disturbances and flank pain. [Tr. 188, 181]. The plaintiff has an established history of hypertension, diabetes, morbid obesity and recurrent pancreatitis.

The plaintiff was admitted to Southwest Florida Regional Medical Center on January 7, 2002. The plaintiff had a mass on his right groin which was thought to be gangrenous. The plaintiff was seen by Dr. Brian Kurland. The plaintiff's mass was determined to be cellulitis which became abscessed and infected and the plaintiff was placed on antibiotics. The plaintiff was given medication to control his sugar while in the hospital. There is a note in the record which states: "[T]he plaintiff is to be discharged home to follow-up with Dr. Torricelli in one week and for home nursing for wound care checks daily. I will discharge him on Augmentin and make sure we cover both strep and anerobes. Also, with increasing sugar levels while he was in the hospital and a hemoglobin A1C of 11 8, we will start him on Actos to try and get him better controlled because he is already showing signs of renal failure." [Tr. 104]. While the plaintiff was hospitalized it was noted that he was a smoker, morbidly obese and suffered from sleep apnea. [Tr. 107].

The plaintiff was seen by the Health Center in September 2003. The records indicate that his blood pressure was 120/90 and that his weight was 323 pounds. The medical notes indicate that there was a compliance problem with the plaintiff taking his medication. Diagnoses results: "[d]iabetes type II, hypertension, left abdominal pain, questionable increased lipids and likely obstructive sleep apnea". [Tr. 176].

The plaintiff was seen at Eye Centers of Florida on October 1, 2003. The plaintiff was having difficulty seeing road signs and reading print. It appears from the record that the plaintiff has Diabetic retinopathy in both eyes and cataracts. The plaintiff was given a new prescription for glasses for his refractive error. The plaintiff returned to the Eye Center on

October 3, 2003 for more thorough testing. The testings revealed macular edema, mascular hemorrhage, microaneurysm and neovascularization in both eyes. [Tr. 112]. The plaintiff was advised that he needed to monitor his blood pressure and bring down his sugar levels, blood pressure and weight. [Tr. 112]. On October 23, 2003, the plaintiff returned to the Eye Center. The plaintiff complained of decreased visual acuity and cloudy vision. This time the plaintiff was diagnosed with retinopathy in both eyes and uncontrolled hypertension. [Tr. 1009]. The plaintiff testified at his hearing that he did not have his driver's license because it was taken away because he had problems seeing even with his glasses. [Tr. 260].

On October 21, 2003, the Plaintiff returned to the Health Center. The plaintiff complained of pancreatic pain. The plaintiff's weight was 334 lbs. and his blood pressure was 140/100. It was noted that he was morbidly obese with a Body Mass Index (BMI) of approximately 45.

The plaintiff was admitted to Southwest Florida Regional Medical Center on November 13, 2003 with abdominal pain, nausea and vomiting. The plaintiff was admitted for acute pancreatitis. The Plaintiff received IV hydration with normal saline. He also received Demerol IV for analgesia and Protonix IV for GI prophylaxis. The plaintiff had several imaging studies done. The CT scan of the abdomen revealed showed "[m]ild fullness of the pancreas without focal area of altered attenuation or enhancement. [Tr. 115, 128]. The radiology report also noted that this CT Scan "does not exclude the clinical diagnosis of pancreatitis," and that it revealed a "possible fatty infiltrate of the liver". The patient underwent an ultra sonogram of the abdomen which was "[n]egative for

cholelithiasis, common bile duct diameter was within normal range". The plaintiff was discharged on the 17th of November with the following diagnoses: "[a]cute pancreatitis of unknown cause, type II diabetes, essential systemic hypertension, morbid obesity with a history of sleep apnea". [Tr. 115].

The plaintiff was seen at the Health Center on January 1, 2004. At that time his blood pressure was 130/90 and his weight was 328 lbs. The plaintiff said he had left lateral thoracic pain which was different from his usual pain. It was noted that the plaintiff had a "[c]hronic dry cough, frequent poly dispsea, weakness, fatigue, dizziness and possible vaso-vagal syncope with syncope." [Tr. 173]. Diagnoses: "[d]iabetes- uncontrolled, hypertension - well-controlled, increased lipids (for which he was prescribed medicine}, acute pancreatitis and the possibility of costochondritis."

The State Agency physician reviewed the Plaintiff's medical records. Dr. A.E. Archibald-Bon, M.D., did his assessment February 27, 2004. and found the plaintiff had the capacity to perform medium work with no visual or postural limitations. [Tr. 129-134].

On March 22, 2004, the plaintiff went to the emergency room at Lee Memorial Hospital with abdominal pain and pancreatitis. [Tr. 140]. During admission it was noted that his blood pressure was 142/89 and that his past history indicated 4 to 5 episodes of pancreatitis per year. On March 29, 2004, the plaintiff had another abdominal CT which revealed a prominent pancreas, within normal limits and his scan was unremarkable. [Tr. 138]. A chest radiograph was negative. [Tr. 143]. Plaintiff was discharged on the March 27th with acute pancreatitis, diabetes mellitus and obesity. They plaintiff was continued on

Glyburide and Enalapril   The plaintiff was advised to stop smoking and given a prescription for nicotine patches and to obtain a follow-up CT scan of his pancreas. [Tr. 137]. Dr. Douglas G. Henricks stated that the probable reason for his pancreatitis was due to his high cholesterol and triglycerides. [Tr. 137].

On April 4, 2004, the plaintiff returned for a post hospitalization follow-up where it was noted that he had "[p]oor insight/noncompliance." [Tr. 172}. On May 18, 2004, at his follow-up appointment, the plaintiff complained of abdominal pain that was different from his typical pancreatic related pain. It was noted that despite the plaintiff taking his medication, his blood pressure was back to 144/100. [Tr. 181]. The plaintiff was also seen at Southwest Florida Regional Medical Center for a follow-up on his pancreatitis and for the low back pain on his left side and constipation. [Tr. 171].

The plaintiff was treated at the Ruth Cooper Center during 2004. On May 11, 2004, plaintiff presented in a "[t]earful state" and said he had "[f]eelings of sadness for the last 3 years". The plaintiff complained about sleep disturbances, decreased energy and poor concentration. The plaintiff's mood/affect was characterized as depressed. The plaintiff's vocational skills, friendship/peer relationships and health were rated as a "[m]oderate problem". The plaintiff's anger control and job performance were rated "moderately severe." The provisional diagnosis from this visit was "[d]ysthymic disorder." [Tr. 200-205].

On May 30, 2004, a State Agency physician, Dr. James B. LeVasseur, Ph.D., completed a Psychiatric Review Technique Form. Dr. LeVasseur found the plaintiff had "no medically terminable impairments." [Tr. 144-157]. Dr. LeVasseur found the plaintiff to have

no history of mental health problems or treatment. He found his "[f]unctional data indicates that his concentration and memory are intact and that he is able to finish tasks adequately, able to follow instructions, able to get along with others adequately". [Tr. 156].

      The plaintiff was seen again at the Ruth Cooper Center. He related that although he had been diagnosed with sleep apnea, he had not tried to see if his insurance plan would cover the equipment he needed. The plaintiff related that for the past year he had been feeling paranoid and had been hearing voices. [Tr. 196]. The plaintiff also related he had drank as a teenager but had been sober for the last ten years. Dr. Catherine Learned, M.D., stated that the plaintiff's alcoholism was in remission. Additionally, his doctors did not mention alcoholism in relation to his pancreatitis. The plaintiff was diagnosed as having "[m]ajor depression with psychotic features and post-traumatic stress disorder. His Global Assessment of Functioning was assessed to be 50.[4] The plaintiff was prescribed Prozac and Trazadone. [Tr. 196-198]. Intervention - treatment plan "[t]o find social outlets when he feels better, seek medical treatment for sleep apnea ...." "[c]ontinue to exercise and watch his diet, and contact 911 or hot line for any suicidal ideation that he feels he could act on". The plaintiff was asked to return to the Center in two weeks. [Tr. 197-198].

      On June 9, 2004, the plaintiff returned to the Health Center for follow-up blood work and for treatment of ant bites that he received prior to May 2004. The plaintiff was referred to a podiatrist for his ant bites. The plaintiff was instructed to return to a normal diet

---

[4]    A GAF score of 50 corresponds to: Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job. *American Psychiatric Assn.,* 2000, 48.

following his most recent hospitalization for acute pancreatitis. [Tr. 168]. At his July 2004 checkup, the plaintiff complained of passing out when he coughed, that he still had left sided pain (with a pain level of 8 on a 1-10 scale). He reported not sleeping at night but sleeping during the day. The plaintiff was referred to a pulmonologist for obstructive sleep apnea. [Tr. 167].

On June 15, 2004, the plaintiff was reviewed by State Agency physician , Lawrence M. Gustin, M.D. Dr. Gustin opined the plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand for approximately 6 hours and sit for 6 hours in an 8 hour day. Dr. Gustin found the plaintiff's blood pressure to be controlled at 118/86. [5] Additionally, Dr. Gustin limited plaintiff regarding hazard and heights due to the plaintiff's obesity. Dr. Gustin also reduced his RFC assessment [from medium to light] because of the plaintiff's obesity, abdominal pain, pancreatitis and hypertension. [Tr. 158-165].

The plaintiff was again seen by Dr. Learned on August 11, 2004. Dr. Learned's notes reflected the following: "[A]XIS I. Major depression with psychotic features. History of alcohol dependence, in remission. Medical: He is continuing to see the medical doctors pretty often. Blood pressure is 176/100. They were unable to find a vein to take blood tests for his pancreatitis. His blood sugar was elevated this morning  - sleeping four to five hours at night. The doctor did increase his doses of diabetic medication and he is breathing quite heavily.  .... this client will show (and  has in the past shown) significant cognitive,

---

[5] It is to be noted that in 2004 the plaintiff had blood pressure readings of 140/96, 130/90, 140/100, 156/110, 130/100 which shows inconsistent readings. [Tr. 166-172].

emotional and behavioral deterioration." [Tr. 190]. Dr. Learned also noted that the drug Abilify had stopped the plaintiff's auditory hallucinations. [Tr. 190]. Intervention - treatment plan "[C]ontinue to follow through with his medical doctor. Continue Abilify 20 mg. at bedtime and Prozac 40 mg. in the morning. He will been seen again in one month".

### III.   SPECIFIC ISSUES AND CONCLUSIONS OF LAW

#### A.   THE ALJ ERRED IN EVALUATING THE PLAINTIFF'S SUBJECTIVE COMPLAINTS OF SYMPTOMS, INCLUDING PAIN

The plaintiff contends that the ALJ erred in evaluating his subjective complaints of symptoms, including pain.

The record shows that the plaintiff suffered from recurrent acute pancreatitis. [Tr. 173, 179]. The record also shows that the plaintiff frequently complained of left flank pain. [Tr. 56, 166, 167, 173]. All documentation provided in the hospital records show the plaintiff was hospitalized for pancreatitis. The plaintiff's amylase and lipase readings supported the diagnosis of acute pancreatitis. While it is true that the plaintiff's CT scans did not show any abnormalities, the radiologist who read his CT scan dated November 14, 2003, stated that the "CT Scan does not exclude the clinical diagnosis of pancreatitis." [Tr. 128].

The ALJ is charged with evaluating the plaintiff's subjective complaints of symptoms including pain. 20 C.F.R. §§ 404.1529(a), 416.927(2006); SSR 96-7P. In evaluating symptoms, the regulations provide that a claimant's statements about pain or other symptoms will not alone establish disability. 20 C.F.R. §§ 404.1529(a), 416929 (2006). Medical signs

and laboratory findings must be present which show a medical impairment(s) which could reasonably be expected to produce the symptom(s) alleged.  20 C.F.R. §404.1529(a), 416.929.  The standard for evaluating pain in the Eleventh Circuit requires,

> (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged pain.

*Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir. 1991).  In fact, pain alone can be disabling, even when its existence is unsupported by objective evidence.  *Francis v. Heckler*, 749 F. 2d 1562, 1564 (11th Cir. 1985).  Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Foot v. Chater*, 67 F.3d 1553, 1561-62.  As a matter of law, the failure to articulate the reasons discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote*, 67 F.3d at 1561-62.

The plaintiff presented evidence of an underlying medical condition - recurrent acute pancreatitis - that was determined through physical examination and lab work.  This condition is one  that could be reasonably expected to give rise to the alleged pain.  The record is replete with documentation that the plaintiff was hospitalized on many occasions and was prescribed  Demerol to control his pain.   The plaintiff constantly and consistently complained of left flank pain which is a symptom associated with pancreatitis as well as  the high amylase and lipase numbers that the lab work provided. . [Tr. 115, 137].   Additionally, the plaintiff's complaints of pain were never discounted by any of the emergency personnel who admitted him to the emergency room/hospital on numerous occasion, nor any of his treating physicians.

    B.    **THE ALJ ERRED IN DETERMINING THE PLAINTIFF COULD PERFORM THE FULL RANGE OF LIGHT WORK AT STEP 2 AND MEDICAL INFORMATION PROVIDED TO THE VOCATIONAL EXPERT WAS INCOMPLETE**

If the plaintiff had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational rules 202.18 and 202.11. However, the ALJ acknowledges that the plaintiff's ability to perform all or substantially all of the requirements of this level of work have been impeded by additional limitations. The ALJ found the Plaintiff's RFC to be as follows:

> 5. "After careful consideration of the entire record, the undersigned Judge finds that the claimant has the residual functional capacity to perform up to light levels of work. The claimant should not climb ladders, scaffolds, or ropes and should not climb at unprotected heights. Because the claimant has moderate difficulties in social functioning he should not be required to interact frequently with the general public. [Tr. 12, Finding no. 5.

To determine the extent to which these limitations erode the unskilled light occupational base, the ALJ asked a vocational expert whether jobs existed in the national economy for an individual with the plaintiff's age, education, work experience and residual functional capacity. The vocational expert testified that the plaintiff would be able to perform the requirements of light work occupations such as a kitchen helper, office cleaner, and assembler. [Tr. 16]. The vocational expert further testified that all the above listed jobs are "[c]lassified as light in exertion and unskilled in nature." [Tr. 16].

13

The ALJ never mentioned the plaintiff's visual limitations [diabetic retinopathy] to the vocational expert or mentioned that the plaintiff had a propensity to pass out, a symptom that is not inconsistent with either hypertension or uncontrolled diabetes.  Failure to present accurate questions to the VE is grounds for reversal and remand.  *Pendley v. Heckler*, 765 F.2d 1561, 1563 (11th Cir. 1985).

### C.     THE ALJ ERRED IN THE EVALUATION OF THE PLAINTIFF'S CREDIBILITY AND THE PSYCHIATRIC EVIDENCE

The ALJ found the plaintiff's testimony that "he slept 15 to 20 minutes every half hour" not to be credible and further that these allegations were not shown or supported by the medical evidence of record.  While the plaintiff reported that he did have sleeping problems both during the night and during the day, the record showed and the plaintiff testified at his hearing that he was not using his CPAP machine.  Thus, the ALJ found the plaintiff to be non compliant with the CPAP machine and his medications, and that he personally observed the plaintiff during the hearing as "[a]ble to remain sitting during the hearing for approximately 3/4 of an hour without any facial gestures or grimaces of pain noted, and no significant difficulty was observed. ..... [F]inally, the undersigned finds that claimant exaggerated his symptoms and restrictions, and that these are not supported by medical signs or laboratory findings to the extent alleged. [Tr. 15].

The plaintiff's medical records support the plaintiff's testimony in that he experienced sleep disturbances and has been diagnosed with sleep apnea.  While the record does indicate that the plaintiff is non-compliant with his medications - Dr. Learned, the

plaintiff's treating psychiatrist stated on August 11, 2004, "[2]. STATEMENT OF JUSTIFICATION FOR CONTINUED TREATMENT: Without routine medical visits to ensure compliance and appropriate intervention, this client will show (or in the past shown) significant cognitive, emotional and behavioral deterioration. [Tr. 190]. The ALJ failed to address Dr. Learned's opinion regarding plaintiff's compliance and "significant cognitive, emotional and behavioral deterioration." [Tr. 15].

The plaintiff's medical history reveals that the plaintiff had "poor insight" into his medical condition. [Tr. 172]. The record references that the plaintiff was a "poor historian." of his own family history and/or medical history. [Tr. 140]. The plaintiff never finished high school and testified he had difficulty writing English and had assistance when he completed his social security reports. [Tr. 252, 61-62, 93].

### D. THE ALJ ERRED IN FAILING TO STATE WHAT WEIGHT HE GIVES TO THE PLAINTIFF'S TREATING PHYSICIANS OR THE OPINIONS OF THE STATE AGENCY PHYSICIANS

In the instance case, the ALJ does provide for the record a recitation of the facts, however, he failed to mention several documented issues. The ALJ failed to address the Plaintiff's visits and treatment at Eye Centers of Florida, where the plaintiff was diagnosed with diabetic retinopathy and possible cataracts. [Tr. 108-114]. The ALJ failed to reference the Plaintiff's unsuccessful work attempt at Wendy's and that he had to quit because he kept passing out. [Tr. 63]. The ALJ only made vague references to the plaintiff's obesity. The record shows that the plaintiff's obesity is serious. The plaintiff falls into the most serious and at risk category of obesity with a BMI of approximately 45 and he already shows the

symptoms of obesity, i.e., diabetes, hypertension, depression and sleep apnea. [Tr. 175] While one of the State agency doctors referred to a lack of end organ damages, the consequences of obesity can already be seen in his retinopathy. Additionally, his treating doctors discussed the possibility of renal failure with him. [Tr. 109-114, 165 and 208].

The ALJ has a duty to assess the RFC based upon the record in its entirety. SSR 96-5-; 20 C.F.R. §§404.1546, 416.945 and 404.1527©), 416.927 (2006). While the ALJ is not required to discuss every piece of evidence, he is required to consider the opinions of the plaintiff's treating ophthalmologist. 20 C.F.R. §§ 404.1527(b), 416.927(b) (2006) (the regulations provide that in making a disability determination, medical opinions will always be considered).

The ALJ's decision shows that he does not provide the reviewing court with a clear statement of the weight that he is giving the various impairment evidence, to-wit: he does not credit or discredit the evidence as to the plaintiff's impairments but merely finds that the plaintiff has the severe impairments of obesity with sleep apnea, diabetes type 2, hypertension, acute pancreatitis and major depression. It is clear from the record that Family Health Center is the plaintiff's primary treating source. The ALJ referenced the plaintiff's visits to the Health Center but did not assign weight to any of the diagnoses and medical evidence they provided. The Eleventh Circuit requires that unless good cause is shown to the contrary, the ALJ must accord substantial weight or considerable weight to the opinion, diagnoses and medical evidence of the plaintiff's treating physician(s). *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982). It cannot be determined by this Court what value he assigned this evidence.

16

Furthermore, the ALJ does not state what weight he is giving the medical opinions provided by the State agency doctor(s). Again, although their findings are mentioned, the Court cannot determined what weight he gave those opinions. The Regulations, at 20 C.F.R. §§404.1527(f), 416.927(f)(2006), require the ALJ to state the weight given to the opinions of the State agency physicians.

## IV. CONCLUSION

**IT IS, RESPECTFULLY RECOMMENDED that:**

There is a reasonable possibility that a proper analysis of plaintiff's exertional and non-exertional impairments would change the administrative results. It is recommended that the decision of the Commissioner be **REMANDED** pursuant to 42 U.S.C. § 405 (g) to allow the Commissioner to conduct an additional hearing to consult with and elicit testimony from a vocational expert to properly consider the limitations, if any, of plaintiff performing light work on a regular and sustained basis and determine the availability of suitable alternative jobs in the local and national economy based on the above-mentioned impairments, to further reconsider the plaintiff's claims in light of the findings of the physicians who treated the plaintiff and to take additional evidence relevant to the plaintiff's impairments and make new findings consistent with this Report and Recommendation

**DONE and ENTERED** in Chambers at Fort Myers, Florida, this 24th day of 2007.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Case No. 2:06-cv-427-JES-DNF
Starks v. Commissioner

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its service shall bar an aggrieved party from attaching the factual findings on appeal and a *de novo* determination by a district judge. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72; *see also* Fed.R.Civ.P. 6; M.D. Fla. R. 4.20.

Copies furnished to:
Honorable John E. Steele
United States District Judge

Jonas H. Kushner, Esquire
For Plaintiff

Susan R. Waldron, A.U.S.A.
Commissioner of Social Security